### Richmond.

### GEORGE DICKERSON V. COMMONWEALTH.

March 16, 1922.

Absent, West, J.

1.  HOMICIDE—*Evidence—Instruments with which Crime was Committed—Case at Bar.*—The evidence in the instant case fell far short of identifying, beyond a reasonable doubt, the pistol and club in evidence as having been the instruments with which the deceased was slain, as claimed by the Commonwealth. The evidence left it equally probable that the crime was committed with some other instruments.

2.  HOMICIDE—*Evidence—Accomplice—Weight of Testimony of Witness, also Accused, of the Homicide—Argument of Counsel—Statements of Counsel Unsupported by the Evidence.*—In the instant case, the testimony of a witness, C, if true, was sufficient to support a verdict of guilty. But C was one to whom the physical fact of footprints pointed, not merely as an accomplice in the crime, but as the murderer, and his narrative was inherently improbable and incredible, and moreover was made after repeated previous denials of all knowledge of the subject, and altogether the circumstances attending the testimony of C indicated that the jury would not have given it credence unless they had been satisfied that he was corroborated. The Commonwealth's attorney in argument stated that accused killed deceased at a certain place near the house of C, went back to the house, changed his shoes for a pair of C's, and then carried the body to where it was found. There was no evidence of any probative value to sustain this theory, which was corroborative of C's testimony, and the action of the trial court in overruling an objection to the statement and refusing to instruct the jury to disregard it was error.

Error to a judgment of the Circuit Court of Halifax county.

*Reversed and new trial granted.*

The verdict in this case found the accused guilty of mur-

der in the second degree and fixed his punishment at ten years in the penitentiary. The judgment under review was entered accordingly.

The deceased, a white man, named Will Rickman, was murdered on the night of Saturday, March 19, 1921, in a most brutal manner. There were two wounds, both of which, according to the testimony for the Commonwealth, were mortal wounds, if inflicted while Rickman was living —one consisting of a fracture of the skull about one and a quarter inches in length on the right side of the head above the ear, and the other consisting of the fracture of the spine on a level with the hip bones, the skin being scraped off at this place in the center of the back, making an abrasion underneath the clothing of the size of a half dollar. In addition to these wounds, there was laceration about the lips, the right corner of the mouth was cut; there were marks of the teeth on the inner surfaces of the lower and top lips, one tooth broken, one missing; there was laceration back of the right ear, about half an inch in length; and there were a number of bruises on the forehead about an inch long, some distance apart, running up and down the forehead. The testimony of the physician, who examined the body as a member of the coroner's jury on the next day after the murder, concerning the appearance of the wounds, is to the effect, that of those on the head and face, "some looked like they were caused by a blunt instrument and some with an instrument that had a sharp point to it"; that the wounds on the face and head could have been caused by a pistol such as the pistol in evidence belonging to the accused; that the bruises on the forehead might have been made by the butt end of that pistol, and the fracture above the ear could have been made by the hammer of the pistol; and that the wound in the back, causing the fracture of the spine, could have been caused by a blunt instrument, such as the club in evidence, which was found at the place

40

at which, according to the theory of the Commonwealth, the murder was committed. This witness testified further, however, that he could not say that the wounds on the face and head were made by the pistol; that there was nothing about these wounds that indicated to the mind of the witness that they were made by the pistol; that they could have been made by some other instrument; and that he could not say that the lick which fractured the spine was hit by the club in evidence. And the evidence fails to disclose that there was any bloodstain on the pistol or club, or other evidence that either of them was an instrument used by the murderer.

The body of the deceased was found lying in the public road "right across one of the tracks made by vehicles." The witness for the Commonwealth, who testified to first seeing the body, was in an automobile with some young ladies, returning from a dance. One of the young ladies was driving the car. This witness, as the car passed along the road, saw in the road what afterwards proved to be the body of the deceased. As to the time of night when this occurred, this witness testified as follows:

"Q. Will you please state to the jury what hour that was that you saw that body?

"A. It was about quarter after twelve.

"Q. That was fifteen minutes after twelve o'clock?

"A. Yes, sir.

"Q. State to the jury how you arrive at that?

"A. I left down the road about four miles, at Mr. Tracey's, about twelve o'clock, and I think it took about fifteen minutes to drive it.

"Q. It certainly would not take over fifteen minutes to drive it?

"A. No, sir.

"Q. It is good gray soil road?

"A. Yes, sir.

"Q. And no hills between the two points?

"A. No, sir.

*"Cross-Examination.*

"Q. Did you look at your watch when you left Mr. Tracey's?

"A. Yes, sir.

"Q. After you left or before?

"A. I got in the automobile and looked at my watch.

\*          \*          . \*          \*

"Q. One of the young ladies was driving?

"A. Yes, sir.

"Q. And she was driving it slowly?

"A. Yes, sir.

"Q. She was not an experienced driver?

"A. I think she was.

"Q. She was not driving fast?

"A. She was not speeding.

*"Re-Direct Examination.*

"Q. You are satisfied that it was not later than 12:15 when you reached that point?

"A. Yes, sir."

Another witness for the Commonwealth testified that, traveling in an automobile, he passed, what afterwards proved to be the body of the deceased lying in the road, between 12:15 and 12:20 o'clock of the night of the murder. That he did not recognize it at the time as the body of any person, and did not stop, but saw something in the road which afterwards proved to be the body of the deceased.

Another witness for the Commonwealth, on cross-examination, but without objection on the part of the Commonwealth's attorney, testified that he had a conversation with

one John Medley the next morning after the murder, and that Medley said that he thought he, Medley, ran over the body of the deceased the night before, and thought at the time that he, Medley, had killed the deceased.

It appears from Medley's testimony, who was a witness for the accused, that Medley was traveling in an automobile truck that night, and left the home of Jim Coleman, presently to be mentioned, which was about a mile from the place in the road where the body was found, not earlier than 12:15 o'clock, so that if his automobile struck the body of the deceased as it lay in the road, this must have been some time not earlier than about 12:30 o'clock of such night. Medley, however, was not asked any question about running over the body of the deceased, and did not testify on that subject.

The coroner's inquest was held the morning following the murder, which was Sunday, at the place in the road where the body was found, the inquest beginning about ten o'clock that morning. Before the coroner's jury met, however, the news of the murder and of the finding of the body had gone abroad in the neighborhood, and a considerable crowd gathered about the place where the body lay in the road and around about the body. There is no direct evidence on the subject of whether the body was or was not moved by any one during the morning before the coroner's jury convened.

When the coroner's jury met, the body was lying in the road, as aforesaid, on the back, the right arm being flexed and partially across the chest. A tooth and an empty pistol cartridge were found near the body. A bottle of extract of pineapple was lying on the chest of the body, and a pint bottle of whiskey, about two-thirds full, was setting up under the right arm of the body. There was no blood in the road near the body, except that when the coroner's jury raised the head in their examination of the body, some

bloody serum ran out of the nostril on the same side on which the skull was fractured. And the testimony for the Commonwealth was to the effect that one of the wounds was near an artery, which ordinarily would have bled considerably, and that if the deceased had been killed where the body was found in the road there would have been evidence of blood in the road from the wounds on the head.

The dwelling house of Jim Coleman, a colored man, is located on the south side of the public road above mentioned, about seventy-five yards off from the public road. This dwelling house is about one mile east of the place where the body was found.

On the Saturday night of the murder there was a dance, and what the colored people call "a party," at the house of Jim Coleman, and a large gathering of colored people were there, of men and women, beginning about 8:30 or nine o'clock that evening and breaking up about one o'clock that night. There was the selling of food and drink, and, according to the testimony for the Commonwealth, the accused, who occupied a room in Coleman's house, as a lodger, was selling intoxicating liquor that night, sometimes in one of the rooms of the house, and at other times in the yard at the rear of the house. Jim Coleman, assisted by others, was selling food from time to time. The house could not hold the crowd, and many were on the outside of the house, here and there in the rear, on the sides and in front of the house, while the party was going on.

The testimony for the Commonwealth is to the effect that about 10:15 o'clock on the night mentioned, the accused was seen in the public road in front of Coleman's house; and that later, about eleven o'clock, the deceased (the only white person who appears to have been at the house of Coleman that night), was seen to come, in a somewhat drunken condition, from one side of Coleman's house, as if coming from the rear of the house, and, as he walked

out towards the front of the house, the accused engaged in conversation with the colored men, Davis and Wood, who were afterwards among the witnesses for the Commonwealth, during which conversation the deceased said: "Some one has been meddling with me" (according to Wood's testimony) ; "Some —— of a —— is picking at me" (according to Davis' testimony). Neither Wood nor Davis asked, nor did the deceased say, who was "picking at" him or "meddling with" him. Davis assured the deceased that nobody should bother him while he was with him (Davis). The deceased asked Davis if the latter had any whiskey. Davis said, "No." The deceased then said: "I have some here, and I want to get some to go with it to make it better." Davis said that he didn't have a drop. The deceased then said that "the whiskey he had was not any good," but that if Davis would go with him out to the public road he would give Davis a drink, and also extended the same invitation to Wood. On getting out to the public road, just in front of Coleman's house, the deceased, Davis and Wood were seen by Harry Crute, a white man, who was passing along the public road at the time in his automobile, going homeward, which was eastward along such road. Crute stopped his car and talked a few minutes with the deceased, Davis and Wood. Thereupon, two other persons coming up, the deceased, Davis and Wood, asked Crute's permission to ride down the public road with Crute, and did so, to a point in front of Bethel Church, a distance of some fifty yards east of the entrance to Coleman's house. There the deceased, Davis and Wood got out of Crute's automobile and Crute went on homeward. This occurred, as Crute, a witness for the accused, testified, at "a few minutes past half-past eleven" o'clock. Crute fixes this time by saying that when he drove up in front of Coleman's house and stopped, as above stated, he looked at his watch and that it was then 11:30 o'clock; and that it was a few

minutes thereafter that he left the deceased, Davis and Wood in front of the church.

Davis and Wood, witnesses for the Commonwealth, as aforesaid, testified that on getting out of Crute's automobile in front of the church, the deceased gave them each a drink of whiskey. Davis says the deceased gave them their drinks out of a quart bottle, which was about half full of liquor at the time. These witnesses further testified that they and the deceased then walked back along the public road to the entrance to Coleman's house, and that at that place they parted with the deceased, the latter going on westward along the public road in the direction of his home and of the place where his dead body was seen in the road within a short time afterwards, and Wood and Davis returning to Coleman's house, from which they not long afterwards departed for their own homes. These witnesses also testified that when they parted with the deceased, as last stated, they saw no one else in sight; met no one, saw no one, and heard no one else, and "heard no difficulty" occur as they went on to Coleman's house. Their testimony as to the time of night when this parting with the deceased occurred is in accord with Crute's testimony, and fixes such parting at about 11:45 o'clock.

The testimony for the Commonwealth developed the following, among other, facts:

When the body of the deceased and its surroundings were being examined at the inquest, a track on the ground, made by the toe of a shoe with nails in it, was noticed just under one of the arms of the dead man. Outside of the trampling in the road of those who had stood or walked around the body, tracks were found and followed which were the same as the track last mentioned. These tracks led from the body to Jim Coleman's house. He was found with shoes on his feet which made the tracks which led from the body to his house. He was asked if he had been to the place

where the body was, and he denied that he had been there and denied all knowledge of the cause of the death of the deceased and of who killed him.

Coleman was, thereupon, arrested and lodged in jail that same day—Sunday, March 20, 1921—charged with the murder. That night an armed mob attacked the jail, and, not succeeding in breaking in, called to Coleman and demanded that he tell them who murdered Rickman. Coleman told them that he did not know who committed the crime. The mob then fired a number of shots at or near Coleman, then paused and said to Coleman that they didn't believe that he killed Rickman, but that they did believe that he knew **who did,** and that if he didn't tell them who it was they would kill him. Thereupon, Coleman again declared that he did not know who killed Rickman, and did this repeatedly. The mob then left the jail and, going to Coleman's dwelling house, burned it to the ground and all of his property there.

Coleman was then—on the next night, being Monday night—removed to the jail at Lynchburg for safe-keeping, and was kept confined there for some time. Subsequently, he was brought back to, and kept confined in, the local jail, where he was still so confined and still charged with the murder at the time he testified on the trial of the accused. Meanwhile, a number of other colored men who were at the party at Jim Coleman's or were seen out in the public road on the night of the murder (including the accused, Wood and Davis, above mentioned, and others) were under arrest and confined in jail, charged with the murder; and the county had a detective employed, who, as well as the Commonwealth's attorney and the sheriff, and a Mr. Bailey, in whom Coleman seems to have had especial confidence, had interviews from time to time with Coleman, and also with others under arrest and not under arrest, some of whom were afterwards used as witnesses for the Commonwealth,

quizzing them on the subject of who committed the murder. The evidence makes it plain that during this time those who were quizzing Coleman repeatedly impressed upon him the predicament in which he stood and would stand when he came to be tried upon the charge against him of having committed the crime of the murder unless he should, prior to his trial, name some one, other than himself, who wore his shoes which made the tracks aforesaid the night of the murder, and unless he should furnish some proof pointing to some one else as the person who committed the crime. Nevertheless, Coleman repeatedly denied to those who quizzed him all knowledge on the subject of who killed the deceased until he (Coleman) was brought back from Lynchburg to the local jail and was being again confined there and the time was approaching when he would be tried for the crime. Coleman then, on April 20, first, either to the Mr. Bailey above referred to, or to the detective (the record leaving it in some doubt to which, in the first instance), and afterwards in the presence of the Commonwealth's attorney and others, and subsequently upon the witness stand as a witness for the Commonwealth on the trial of the accused, made the statement which charged the accused with the crime, the material portions of which statement are as follows:

Coleman said that the shoes which made the tracks aforesaid were his every-day shoes. That on the night of his dance or party, he took them off and left them in the shed room of his house, which was one of the rooms on the first floor of the house. That he wore that night, while the party was going on, another and lighter pair of shoes. That he went into the shed room between ten and twelve o'clock that night, and the lamp was burning and the shoes of the accused, George Dickerson, "were setting with the toes that way" (indicating), and that he, Coleman, looked and said: "Uhm! good Lord." That the accused's shoes were stand-

ing there and Coleman's shoes were gone. That the next time he, Coleman, saw the accused, the latter came to the front door and said: "Uhm! you all here dancing," and Coleman said, "Yes." That thereupon the accused danced "from the door clean into the kitchen and asked Miss Chappel to have a treat" and also offered Coleman a treat. That "a good while after that," he, Coleman, heard the accused "talking between the stable and the house." That he, Coleman, was then standing in his kitchen door and saw the accused and two other persons, whom he did not know, standing with their backs to him, Coleman. That he, Coleman, recognized the accused by his voice. That the accused said: "Somebody is dead." That he, Coleman, said: "What do you say, George; who is that dead?" That the accused said "nothing" and the three walked away. The statement of Coleman, as given on the trial of the accused, thereupon continued as follows:

"Q. When was the next time you saw (the accused)?

"A. The next time I saw George he came up to the kitchen door. After he said that, he came up to the kitchen door, and I was standing there, and I went and looked. At the kitchen door I stopped and I said: 'George,' and he looked at me. I said 'George, who is that you say is dead *up the road?*'" (Italics supplied.) "He didn't say nothing. I said: 'George, who is that dead *up the road?*'" (Italics supplied.) "I said: 'George, what did you wear my shoes for? Didn't you wear my shoes *up the road?*'" (Italics supplied.) "And he said, 'Yes.' I said: 'Who is that dead *up the road?*'" (Italics supplied.) "And he looked in my face, and he said: 'I killed a man.' I said: 'George, Lord, what do you mean? when I had my dance, and you wore my shoes,' and I said: 'What did you want to kill a man for?' and he said: 'Because I am so God damn evil!'"

\*          \*          \*          \*

"Q. Did he tell you the name of the man?

"A. No.

"Q. He said, when you asked why he killed the man, because he was so God damn evil?

"A. Yes, sir.

"Q. When did you hear the news of the body being found up there?

"A. Between two and four o'clock.

"Q. How did you find it out?

"A. Riley Street came back on the mule.

"Q. Did you all go up there that night?

"A. No, sir.

"Q. Who went there?

"A. Myself and George went up there on my buggy with that little Roane horse of mine hooked to it.

"Q. You all went up there where the body was?

"A. Yes, sir, between eight and nine o'clock.

"Q. Did you all have any conversation coming back?

"A. Coming back, he spoke: 'Uhm! uhm! it's a pity; that man is dead. I wish I did know who killed him.' I didn't say anything until we got the other side of Mr. Luke Anderson's, and I said: 'George, what made you want to wear my shoes off last night?'

"By the Court:  Talk a little louder.

"A. I asked him what he wanted to wear my shoes for, and he didn't say a word, but cast his eyes in the foot of the buggy. I said: 'George, it's a pity you wore my shoes last night and this man got killed last night.' He didn't part his lips, and I didn't part mine.  *  *  *'"

*           *           *           *

"Q. Why did you tell people you didn't know, when you knew it was George?

"A. Because he told me to keep my mouth shut.

*           *           *           *

"Q. Did he say anything about wearing your shoes off after you were arrested and in jail?

"A. Yonder in Lynchburg.

"Q. What did he say?

"A. I got to a crack where I could peep in the cell and I said: 'George,' and he said: 'Huh!' I said: 'George, what did you wear my shoes off the night I had that dance?' and he dropped his head and never said a word, only to keep my damn mouth shut.

"Q. Was there anybody present when he said that?

"A. Yes, sir; Daniel Harris was in the cell with him.

"Q. Did he say anything else to you in this jail about this case?

"A. Yes, sir.

"Q. When was that?

"A. The Sunday he got out on bail he told me everything was all right; to keep my mouth shut; that everything would come out all right.

"Q. When was that?

"A. That was the same Saturday that they brought us back here to Houston from Lynchburg.

"Q. At the time he was turned out of jail, did you see him any more after that?

"A. Yes, sir.

"Q. When was it?

"A. If I am not mistaken, he came back on Wednesday from home to Houston.

"Q. Did he go down to the side of the jail?

"A. Yes, sir; he gave me a dollar.

\*              \*              \*              \*

"Q. What did he say then?

"A. He gave me the dollar and told me to keep my mouth shut.

"Q. Did anybody else hear that?

"A. Yes, sir.

"Q. Did other people in the jail hear that?

"A. Yes, sir."

On cross-examination, Coleman admitted that, in talking with his own counsel, prior to his declaration aforesaid, he told his own counsel that the shoes which made the tracks aforesaid sat in his room from the time he took them off, as he stated, "and hadn't been touched by anybody until about light, when (he) called for them to go out to get some corn for two men who came there in a wagon"; and that, when arrested, on Sunday, March 20th, he told the sheriff that the pistol was his, which was introduced in evidence by the Commonwealth as belonging to the accused.

Daniel Harris, in his testimony on the trial of the accused, corroborated the statement of Coleman as to his calling to the accused in the cell of the latter in the Lynchburg jail and asking the accused about wearing the shoes, and that the latter made no reply except to tell Coleman to keep his mouth shut. Daniel Harris, however, was one of those under arrest, charged with the same crime, and it was shown that he lived with Coleman, and he admitted having, at a previous time, denied that he knew anything whatever about the case.

The place at which the deceased, Rickman, was killed, according to the theory of the Commonwealth's attorney, was about thirty-five or forty yards from the public road above mentioned, just in the edge of a body of woods which stood to the west of Coleman's dwelling house. Between this body of woods and Coleman's house, there was a strip of open field about forty-five yards wide. And the public road, as it goes on westward from the entrance therefrom to Coleman's house (at which point the public road is about seventy-five yards from Coleman's house), curves toward the south, so that the spot at which the deceased was killed, according to the theory aforesaid, while within thirty-five or forty yards of the public road, was only about fifty yards from Coleman's house. This spot was somewhat nearer the place where the body was found than Coleman's house, but was practically a mile away from the latter place.

The whole of the evidence on which the Commonwealth has to rely to sustain the theory that the deceased was killed at the spot last mentioned consists of the testimony of two witnesses—a Mr. Wagstaff and Ed Rickman, a brother of the deceased.  They made an examination of the premises about Coleman's house on Monday afternoon, the second day following the murder.  There had been no. rain in the meantime.  Later on, just when does not appear in evidence, Wagstaff, in company with the Commonwealth's attorney and a Mr. Martin, made another examination of the same locality, with the result stated in the quotations from Wagstaff's testimony as to the latter examination presently to be made.

Wagstaff's testimony just referred to is as follows:

\*          \*          \*          \*

· "Q. (By the Commonwealth's attorney.) Did you go to that place after the murder and make an examination of the premises?

"A. Yes, sir.

"Q. What day was that?

"A. Monday evening after he was buried.

\*          \*          \*          \*

"Q. State what you found.  Did you find any evidence of any blood or murder there?

"A. Yes, sir.

"Q. Where was it?

"A. It was right over there; I guess fifty yards from the house, or it may be not that far.

\*          \*          \*          \*

"Q. Did you find any tracks?

"A. Yes, sir; there was three or four tracks leading from the back part of Jim Coleman's house coming across the field.  \*  \*  \*

"Q. What kind of tracks were they?  Do you think you could identify any of those tracks?

"A. It was a shoe; I suppose No. 5 or 6, or maybe larger than that.

"Q. Was it a small track or a large one?

"A. A small track.

"Q. What size man was Will Rickman?

"A. I reckon he would weigh 130.

"Q. Do you know what size shoe he wore?

"A. No, sir.

"Q. To the best of your knowledge, from the size of this shoe, would it correspond with his shoe?

"A. Yes, sir.

"Q. That track came from the rear of Jim Coleman's house, across the field to the scene of the murder?

"A. Yes, sir.

"Q. Now, could you tell from the tracks that were made whether the man was walking or running?

"A. He was running; it looked like pretty good speed.

"Q. The tracks were far apart, were they?

"A. Yes, sir.

"Q. What did you find at the scene of the murder?

"A. I saw blood there.

"Q. You saw blood on the ground?

"A. I saw blood on the ground.

"Q. What was the condition of the ground?

"A. It was trampled down.

"Q. Evidence of a scuffle?

"A. Yes, sir.

"Q. Were you, later on, with Mr. Martin and me when we went down to examine the ground?

"A. Yes, sir.

"Q. Were you present when we found this club here? (Referring to the club in evidence to which reference is above made.)

"A. Yes, sir.

"Q. See if that is the club?

"A. Yes, sir; that is the club.

"Q. Where was it found?

"A. I don't suppose it was as far as from here to the corner of that table from where I showed you the man was killed.

"Q. What was the condition of the leaves underneath that club?

"A. It looked like it had been laid down" (on) "a day or so before.

"Q. The leaves were fresh, were they?

"A. Yes, sir.

"Q. You have testified to that, to the best of your knowledge, you identified Will Rickman's track running from the rear of Jim Coleman's house up to this point. Did you find any other tracks?

"A. Yes, sir; there were three or four tracks along there.

"Q. I suppose you could not identify the others?

"A. No, sir; I paid but mighty little attention to them.

"Q. Were they large tracks?

"A. Yes, sir. I called one or two of his brothers when we started across the field.

"Q. Which one of his brothers went there to examine them?

"A. Ed, I think."

&ast;   &ast;   &ast;   &ast;

The testimony of the brother of the deceased above referred to, Ed Rickman, was as follows:

&ast;   &ast;   &ast;   &ast;

"Q. Did you go with Mr. Fred Wagstaff and examine the premises?

"A. Yes, sir.

"Q. Did you see the place on the edge of the woods where the struggle occurred?

"A. Yes, sir.

"Q. What evidence did you see?

"A. I saw his track coming from the house.

"Q. Whose track?

"A. My brother's.

"Q. Did you identify that as your brother's track?

"A. Yes, sir.

"Q. What size shoe did your brother wear?

"A. Five.

"Q. A small foot?

"A. Yes, sir.

"Q. He was a small man, wasn't he?

"A. Yes, sir.

"Q. Where did the tracks come from?

"A. The west end of the house.

"Q. That is the rear of the house?

"A. Yes, sir.

"Q. And came across the field up to the scene where the struggle appeared to have occurred?

"A. Yes, sir.

"Q. What evidence did you see of a struggle at that place?

"A. I saw a stick there.

"Q. Is that the club there?

"A. Yes, sir.

"Q. What was the condition of the ground there?

"A. The ground looked like it was trampled up right smart.

"Q. Did you see any blood on the ground there?

"A. Yes, sir."

There was no evidence introduced by the Commonwealth which tended to show with any degree of definiteness that the accused was outside of the Coleman house at any time on the night of the murder for as long a period of time as half an hour. The most that such testimony could be said to tend to show is that the accused possibly may have been absent from the house for as long as half an hour during some part of the night between about eleven or 11:15 or 11:30 o'clock and 12:15 or one o'clock; but this can

scarcely be said to be proved by such evidence as a fact, with any degree of probability, certainly not beyond a reasonable doubt. The testimony for the accused was to the effect that he was seen here and there about the house during the night from the time the party began until after the murder had been done, at no longer intervals than some ten minutes from time to time.

*M. B. Booker* and *Benj. Watkins Leigh,* for the plaintiff in error.

*Attorney General Jno. R. Saunders, Assistant Attorney General J. D. Hank, Jr.,* and *Second Assistant Attorney General Leon M. Bazile,* for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The only evidence there was before the jury to connect the accused with the crime of which he was convicted, consisted of (a) the testimony for the Commonwealth concerning the instruments with which it is claimed the murder was committed; (b) the testimony of Jim Coleman; and (c) the testimony of other witnesses locating the place of the killing, according to the theory of the Commonwealth's attorney, in close proximity to where the accused was shown to be on the night of the murder.

[1] (a) With respect to the instruments with which the crime was committed:

The evidence falls far short of identifying the pistol and club in evidence as having been, beyond a reasonable doubt, the instruments with which the deceased was slain. The evidence leaves it equally probable that the crime was committed with some other instruments.

[2] (b) With respect to the testimony of Coleman:

That testimony, if true, was sufficient to support the verdict of the jury. But it was the testimony of one to

whom the physical facts of the tracks of the shoes (owned by and found on his feet when he was arrested) pointed, not merely as an accomplice in the crime, but as the murderer. The narrative of the alleged confession of the accused which such testimony presented to the jury is so inherently improbable and well-nigh incredible in itself, and contains, in its repeated references to the dead body being "up the road," such evidence of knowledge on the part of Coleman of the location of the body, which nothing the accused had then said gave him information about (furnishing, indeed, internal evidence, either of the guilt of Coleman of the crime, or of other knowledge about it on his part than that derived, as he claimed, from the accused), as to make such narrative doubly unreliable. Moreover, the circumstances of the repeated previous denials by Coleman of all knowledge on the subject (some of such denials made when being shot at by the mob, under threat of instant death if he did not disclose what he knew) make it almost unbelievable that his narrative aforesaid could be true and that he could have refrained from divulging some portion of it before he did. And further, there are the circumstances that, preceding the telling, Coleman took time to frame the story he told; that he was meanwhile having repeatedly impressed upon him, by the detective and others, the predicament he was in unless he could lay the crime upon some one else. These considerations convince us that the jury would not have given credence to the testimony of Coleman had they not been satisfied that he was corroborated by other evidence in the case connecting the accused with the commission of the crime.

There was absolutely no evidence before the jury to corroborate the testimony of Coleman, connecting the deceased with the commission of the crime, except the testimony of Daniel Harris, and the testimony with reference to the location of the place at which the deceased was killed.

As to Daniel Harris' testimony, it merely corroborated Coleman in his testimony, that while in the Lynchburg jail he asked the accused why the latter wore his (Coleman's) shoes, and that the accused made no reply except to tell Coleman to shut his mouth. Harris' previous statement to the contrary, and his intimacy with Coleman, and his being himself one of those who had been arrested and charged with the same crime, were circumstances which indicate that the jury would not have given credence to Coleman's testimony upon the mere corroboration afforded by this testimony of Harris.

(c) We come, then, to the consideration of the testimony with reference to the location of the place at which the deceased was killed.

If the fact was that the deceased was killed at the place within fifty yards of the house of Coleman (the evidence showing that the accused was in and about such house on the night of the murder and about the time the murder was committed), the accused, according to the evidence for the Commonwealth, may have been absent from the house, at some time, long enough to have done the killing, and possibly, at another time, long enough to have gone, wearing the shoes of Coleman, and carried the body from such place to the location in the road where the body was found; although the testimony for the Commonwealth failed to show affirmatively that the accused was at any time absent from Coleman's house long enough to have so carried the body. That is to say, in such case the evidence would have shown that the accused may have had the opportunity to commit the crime and take the body to the place at which it was found in the road. Whereas, if the fact was that there was no proof of where the killing took place (the evidence showing that the deceased was not killed at the place at which his body was found), there was an absence of evidence to show that the accused had the opportunity to com-

mit the crime and dispose of the body as aforesaid.   In such situation, the fact that the deceased was killed at the place in close proximity to Coleman's house was an essential link in the chain of the circumstantial evidence relied on by the Commonwealth to connect the accused with the commission of the crime.

Accordingly, as appears from one of the bills of exception in the case, the attorney for the Commonwealth, in his closing argument before the jury, made the following statement:

"* * * The facts are that George Dickerson was behind that house selling whiskey.   Rickman went back there and bought whiskey from him and accused him of watering it, and they had a row about it.   After Rickman left George Dickerson, he went back there and the difficulty was renewed.   Of course we do not contend George Dickerson changed his shoes then; he didn't have time, he chased him across that field, killed him, laid him over the fence and then came back to the house and put on Coleman's shoes and then carried the body to where it was found in the road."

To such statement of the attorney for the Commonwealth, the accused, by counsel, objected on the ground that it was not supported by the evidence and that there was no evidence in the case on which to base the statement; that it was an appeal to the prejudice and passion of the jury, and moved the court to tell the jury not to consider this statement; but the court overruled the defendant's objection to said argument and declined to instruct the jury to disregard the same.   This action of the court is made the basis of one of the assignments of error.

We are of opinion that this assignment of error is well taken.

There was before the jury absolutely no evidence of any probative value, even if it had been a civil case, that any

human being was killed at the place referred to in the statement of the Commonwealth's attorney.

There was no evidence whatever of tracks made by the shoes of Coleman, making the nail prints, or of any other tracks, going from the alleged place of the killing to the place where the body was found in the road. There was no evidence explaining why such vestiges were not apparent on the ground, if they were looked for and were not found. And we find no evidence in the record of the existence of any fence, such as is referred to in the statement of the attorney for the Commonwealth.

There was no evidence that the blood seen at this place was human blood; or that the tracks from the house across the open field made by some person wearing No. 5 shoes were made by the deceased, rather than by some other person wearing that size shoes. No peculiarity whatever about such tracks was shown in evidence.

Preceding the party, doubtless many fowls and likely some animals were killed to provide food which was sold at the party. The whole of the testimony for the Commonwealth on the subject under consideration is entirely consistent with the theory that the tracks of the three or four persons seen across the open ground near the house (not merely of two persons, of the deceased and accused, according to the statement of the Commonwealth's attorney) were the tracks of some persons chasing a fowl or a pig; that the blood on the ground was the blood of a fowl, or of an animal, caught and killed there; and that the disturbance of the ground at that place was caused by a no more serious tragedy. And as to the club: There were doubtless many such lying about that and other bodies of woods in the vicinity. There was no evidence that this club had struck across the body of any person or had been handled by human hands, recently before it was found. Indeed, the evidence fails to show beyond a reasonable doubt that the

wound in the back of the deceased was made with any club whatever. This wound may have been made, consistently with all of the evidence, by some other instrument, possibly by some automobile running over the dead body in the road. This hypothesis is consistent with the evidence as it appears in the record.

And the circumstances of the public disappointment which would naturally ensue if all of the many persons suspected of and charged with the crime should escape conviction rendered it peculiarly a case in which the jury were liable to be misled into drawing inferences and reaching conclusions touching the guilt of the accused not warranted by a calm and dispassionate consideration of the evidence.

It seems plain, therefore, that the action of the trial court in overruling the objection to the statement of the Commonwealth's attorney and refusing to instruct the jury to disregard such statement, misled the jury into erroneously thinking that there was sufficient evidence before them to sustain the theory of the Commonwealth's attorney that the killing took place in close proximity to the house in which the accused was, as aforesaid; and that the testimony of Coleman was thus corroborated. And we are convinced by the considerations aforesaid that, but for being so misled, the jury would not have convicted the accused upon the other evidence in the case.

Because of such action of the trial court, the case must be reversed and a new trial will be granted to the accused.

Burks, J., concurs in results.

*Reversed and new trial granted.*